Gloria Malesardi
2263 Fifth Street
East Meadow, New York 11554
Phone: 516-735-2412
Email: Globird@me.com
Gloria Malesardi, Pro Se

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| GLORIA MALESARDI<br><br>Plaintiff,<br><br>v.<br><br>LONNIE FINKEL<br><br>Defendant. | Case No.: 3:25-CV-09875-VC<br><br>ASSIGNED TO: DISTRICT JUDGE VINCE CHHABRIA<br><br>AMENDED COMPLAINT<br><br>Complaint Filed: November 17 ,2025<br>Demand for Jury Trial: YES<br>Trial Date: None Set |

**I. The Plaintiff filing this Complaint is a New York resident.**

Gloria Malesardi
2263 Fifth Street
East Meadow, NY 11554
Telephone: (516) 735-2412
Globird@me.com

**II. The Defendant in this case is Lonnie Finkel an individual residing in California.**

Lonnie Finkel
1999 Harrison Street, Suite 1800
Oakland, CA 94612
Telephone: Office (510) 344-6601 Mobile (925) 998-3394
lfinkel@finkellawgroup.com

**III. Jurisdiction**

The United State District Court for the Northern District of California has jurisdiction because the Plaintiff Gloria Malesardi is a resident of New York, and Lonnie Finkel is a resident of California. The matter involves a controversy in excess of $75,000. See 28 U.S.C. Section 1332. In addition, the case involves a Federal question, see 18 U.S. Code Section 1962 Prohibited Activities.

**IV. Venue**

The actions of Defendant occurred both in the State of California and the State of New York.

**V. Preliminary Statement**

In submitting this Amended Complaint I respectfully want to advise the court that I am not a serial plaintiff or defendant who files meritless or frivolous papers with the courts.

This is the first time I have faced a barrage of filings from teams of lawyers and my filings with this Court and the New York Federal Court were done in good faith, and I will take full responsibility for all of the filings were done with advice from pro se resources from both New York and California, and in the New York filings with active advice from the pro se office at the Eastern District Court House in Hauppauge, New York. The purpose of this Amended Complaint is to make a clear distinction between my personal cause of action in tort and possibly under a Federal statute against Defendant Finkel for his intentional and tortious infliction of physical and emotional intimidation, harassment and extortion against me. As I explained in the Amended Complaint the

causes of action are not duplicative of state court litigation which involves the Estate of Steven Malesardi and my role as the Executor of the Estate.

This is not a malpractice case as there was never an attorney/client relationship.

In the California Superior Court case the cross-complaint was made in my furtherance of my defense against Finkel as a plaintiff who is seeking another $400,000 plus from me after looting the Estate with outrageous and unearned fees of more than $600,000. In coming days, I will amend the Cross-Complaint in that case to make it clear that I am not seeking the same type of damages, actual and punitive that I am seeking in this case.

**VI. Statement of Case**

1) This is a tort action and not a malpractice claim arising from a course of action over a period of years by Defendant Lonnie Finkel's use of his professional skills and expertise to intentionally harass and intimidate Plaintiff Gloria Malesardi creating overwhelming physical and emotional harm, anxiety and suicidal thoughts to Plaintiff Gloria Malesardi.

2) This case is a tort distinct from Gloria Malesardi's Cross-Complaint against Defendant Finkel in the California Superior Court Case No. CGC-25-624477, where Gloria Malesardi (i) is seeking to defend herself against Defendant Finkel's demand for additional unearned legal fees of more than $400,000 in connection with an Estate matter in which Gloria Malesardi is the Executor, and (ii) additionally the Cross-Complaint in the California Superior Court seeks to recover on behalf of the Estate more than $600,000 of overcharged and unearned legal fees. Gloria Malesardi intends to amend the Cross-Complaint to remove any claims and damages in the California Superior Court Case that are duplicative in this Federal Case. Accordingly; Gloria Malesardi will file an Amended Cross-Complaint in the California Superior Case, and will furnish a copy to this court within ten business days.

3) Defendant Lonnie Finkel is an attorney practicing in California who has used his skills and expertise in an intentionally tortious manner in filing unsupported and factually untrue legal actions against the Plaintiff.

4) The Defendant Lonnie Finkel's motive for these intentionally tortious actions are to attempt to extract unnecessary and excessive legal fees from Plaintiff Gloria Malesardi who is the

sole Executor of the Estate of Steven Malesardi, creating overwhelming physical and material emotional harm, anxiety and suicidal thoughts to Plaintiff Gloria Malesardi.

5) Lonnie Finkel in his intentionally tortious actions attempting to extract unnecessary and excessive legal fees from the Estate of Steven Malesardi to whom Gloria Malesardi is the sole Executor, has attempted to extort Gloria Malesardi of moneys in excess of $400,000 in violation of Federal Law 18 U.S. Code Section 1962 – Prohibited Activities.

6) The Defendant Lonnie Finkel in his intentionally tortious attempt has committed Fraud against Gloria Malesardi in violation of California Civil Code Section 1572.

**VII. Part 1 Statement of Facts in Complaint**

(001) I am Gloria Malesardi, a single woman, age 66.

(002) I have a BBA degree in Accounting that I earned in 1998, and for almost 14 years worked at a company doing internal financial management. I retired in 2013 to be a fulltime caregiver for my father, who died in 2017.

(003) I have never been involved in a legal dispute or lawsuit of any kind, and I have never hired an attorney. My only familiarity with courts and lawyers before this case was I was summoned for jury duty in Nassau County, New York on several occasions, but was never selected.

(004) Over a period of several years Lonnie Finkel directed against me in New York and California intentionally tortious verbal assaults, intimidation, extortion, fraud, visits by his agents of to my New York residence intended to frighten me into paying him monies that he is not entitled to.

(005) Santa Cruz Probate Court Trial Case No: 20PR00409 before California Probate Judge Timothy Schmal was scheduled to commence on May 27, 2025 for the Estate of Steven Malesardi and is now pending.

(006) My brother Steven J. Malesardi, was a resident of California.

(007) Steven died in October 2020.

(008) I was named in Steven's will as the executor of the **Estate,** which had property/assets of approximately $850,000, including ownership of I FIX THINGS, LLC a sole proprietor business of home design.

(009) At the suggestion of Steven's accountant, I hired attorney Ken Begun, a licensed California attorney to handle the probate of the Estate in the Probate Court of California.

(010) After Steven's death the Estate was sued by Sean and Colleen Broderick, a customer of I FIX THINGS, LLC for various claims.- (**The Broderick Lawsuit**), with damages claims of approximately $400,000.

(011) The Broderick Lawsuit was filed in a California state court in 2021.

(012) Ken Begun told me the Estate needed a litigator. Steven's accountant recommended the Estate hire Lonnie Finkel to defend the Estate against the Broderick's claim.

(013) On that recommendation, the Estate entered into a legal retainer agreement dated July 23, 2021 with Lonnie Finkels' law firm, Finkel Law Group, P.C..

(014) A copy of that retainer agreement is on TAB #1.

(015) The Retainer Agreement was between the Finkel Law Group, P.C. and the Estate of Steven Malesardi and the I FIX THINGS, LLC business entity.

(016) I SIGNED THE RETAINER AGREEMENT AS THE ESTATE EXECUTOR.

(017) I DID NOT SIGN THE RETAINER AGREEMENT IN MY INDIVIDUAL CAPACITY, AND NO AMENDMENT OR SUPPLEMENT TO THE RETAINER AGREEMENT CONTAINS ANY PERSONAL OBLIGATION OR LIABILITY. THER IS NO ORAL AGREEMENT.

(018) Lonnie Finkel told me the Broderick's case was simple and because he was such an experienced lawyer, the Estate would win the case at a very modest legal fee.

(019) Lonnie Finkel could have settled the case before trial, but insisted the Broderick's claim was a loser and told me the Estate would benefit by going to trial.

(020) Knowing that I was unsophisticated, Lonnie Finkel saw an easy mark and took advantage of me and turned a very simple case that should have been settled for less than $100,000 into what my deceased Father would call a "federal case" that lasted for more than 3 years, including a 5 week trial in the Alameda court (the **"Litigation Term")**

(021) At the end of the trial, Lonnie Finkel lost the case and the Broderick's were awarded damages against the Estate of $513,010; plus, interest of $179,201.36 and costs of $161,424.27; totaling $853,635.63.

(022) Over the course of the Litigation Term, Lonnie Finkel demanded payments from the Estate of $599,479.23 plus $339,069.34 totaling $938,548.57.

(023) Lonnie Finkel did not notify the Probate Court of these fee demands, and did not have Probate Court approval to receive these fees.

(024) Lonnie Finkel told me that either the Estate or me must pay these fees' or else!!

(025) As Executor I had the Estate pay these fees totaling $599,479,23.

(026) As Executor I told Lonnie Finkel that these fees would completely drain the Estate, which is a true fact.

(027) But having drained the Estate of all its assets and losing the case, Lonnie Finkel has demanded that I pay him additional fees and interest of $368,762.66, as of May 9, 2025.

(028) When I told him that I was not responsible for these fees, and in any case the demand for more money was completely unprofessional, he then used his aggressive and arrogant personality to engage in a series of intentionally tortious confrontations, threats and false statements against me in California and New York that have caused me, and continue to cause me overwhelming physical and emotional harm and anxiety.

(029) In a filing to California Probate Judge Timothy Schmal on December 12, 2024, Estate counsel Ken Begun advises the Court:

*"However, toward the end and after the estate's funds dwindled and Lonnie realized he may not be paid if full on his final invoices, the relationship became hostile when Lonnie demanded payment for his bills without providing Gloria backup details for charges on the bills. At one point, there was an altercation during trial lunch break out front of sidewalk of a cafe. Lonnie got in Gloria's face, steamed and swore at her" Fuck off, Fuck you, I am going to sue you for every penny you have." The cafe owner came over to console and asked Gloria if she was okay. Gloria was frightened and shaken by the altercation and did not feel safe near Lonnie and when she returned to the courthouse asked the security staff at the entrance if the court could provide her security when she left court at the end of the session. The court provided Gloria security outside the courtroom to leave the courthouse at the conclusion of the day's session.*

(030) On at least one occasion Lonnie Finkel told me when I was at my New York residence that if I didn't pay these fees, I was committing a crime of 'theft of services' and would be arrested and thrown in a California prison.

(031) On at least one occasion Lonnie Finkel told me that when I was in New York if I didn't pay these fees he would send people to take away my house and my retirement account.

(032) On at least one occasion when I was at my New York residence Lonnie Finkel threatened me boastfully shouting I can't wait to get you on the witness stand; I will destroy you. I will bury you.

(033) On several occasions Lonnie Finkel would interrupt me, talking over me for extended periods of time telling me not to interrupt him, only to not answer my questions but repeat the history of the civil lawsuit. When I would repeat my original question Lonnie Finkel would become agitated, flip to an aggressive and combative tone, insult and use profanity at me, then claim he needed to hang up before he really gets pissed off.

(034) These abusive and threatening actions against me in both California and New York were not isolated incidents, but a pattern of intentionally tortious outrageous statements, threats and actions, often witnessed by several individuals and public bystanders, to harass, intimidate and extort payments from me that I have no legal or moral obligation to make (*See TAB #2) ..my notes of Lonnie Finkels' verbal assault against me on June 4, 2024, outside of Alameda Courthouse, that required me to ask Court Security for protection from Lonnie Finkel.*

(035) The Estate Probate Attorney Ken Begun, was a witness to this intentional harassment and intimidation.

(036) At Probate Mediation in Santa Cruz Court, Ken Begun informed me of a settlement offer proposed by Lonnie Finkel. Lonnie Finkel offered to dismiss his claims against the Estate and the Executor if I would personally accept claims from Finkel Law Group.

(037) On a conference call between Lonnie Finkel, Ken Begun and myself in May 2024, Ken Begun had to tell Lawyer Lonnie to stop repeatedly calling me a liar over mailing a check to Finkel Law Group.

(038) Finally, Attorney Ken Begun advised I file a formal complaint against Lonnie Finkel. I filed a complaint on January 7, 2025 with The State Bar of California ..(See TAB #3)

(039) The last paragraph of the CABAR Complaint states. " *Mr. Finkel demonstrated unprofessional and abusive behavior when Mr. Finkel verbally assaulted Client (I am not technically his client) outside the Alameda courthouse during a lunch break at the civil trial . Mr. Finkel used ridicule, offensive profanity and violent gestures threatening he would sue his Client (referring incorrectly to me, who was not his client) When Mr. Finkel did not like his Clients' response (referring incorrectly to me, who was not his client), to a situation, he would yell, use profanity make threats and hang up the phone.".*

(040) In retaliation of the filing of the attorney misconduct Complaint, and to intentionally delay the Probate Court Trial, Lonnie Finkel filed Case CGC-25-624477 in Superior Court of California, City and County of San Francisco, a completely meritless and frivolous action **(The Lonnie Finkel Complaint)** against me, with false statements, claiming that I committed, among other matters Fraud and Deceit, Fraud and Deceit, Concealment, Fraud and Deceit, False Promise, Fraud and Deceit Negligent Misrepresentation.

(041) My Probate Attorney Ken Begun sent me a copy of the Lonnie Finkel Complaint that confirmed that Lonnie Finkel would disregard prohibitions that he was under during the investigation of the California Bar Complaint.

(042) The California action by Lonnie Finkel, along with other threatening messages directed against me in New York has frightened me to death. As a single woman who lives alone, I have been forced to move away from my residence and stay at a friend's home.

(043) Since filing the Lonnie Finkel Complaint, Lonnie Finkels' agents have come to my New York residence on several occasions and my neighbors have told me they have my house under surveillance.

(044) As result of Lonnie Finkels' intentionally tortious threats, intimidation, and harassment using emails and telephone calls (interstate commerce) directed at me in New York, my health has declined. I have no energy, stopped eating regular meals, I cannot help my elderly friends who depend on me for companionship. I have no interest and stopped all socializing with friends. I have

trouble falling and staying asleep. I have nightmares someone is following me. I am afraid that if his agents find me they will try and force me to go to California or face contempt to court. I have severe anxiety and depression, suicidal thoughts, and I am seeking professional help.

(045) Because Lonnie Finkel is smart and knows the legal system, he has told me on more than one occasion, he has friends and connections in New York. I am fearful that he will continue to harass, threaten me, or show up at my home after he finds out about this lawsuit, I do fear for my safety. But I have no choice to defend myself by filing this lawsuit.

**VIII. Part 2 Legal Basis in Complaint by Plaintiff Gloria Malesardi**

(046) **My claims are based on intentionally tortious matters numbered:**

**#1 Intentional Infliction of Emotional Distress**

**#2 Fraud**

**#3 18 U.S. Code Section 1962 Prohibited Activities**

**CAUSES OF ACTION**
**FIRST CAUSE OF ACTION**
**#1 Intentionally Tortious Infliction of Emotional Damages**

(047) See Statement of Facts: (004), (005), (018), (019), (020), (024), (027), (028), (029), (030), (031), (032), (033), (034), (035), (036), (037), (038), (039), (040), (041), (042), (043), (044), (045).

(048) The Second Restatement reads: "One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress" (Restatement [Second] of Torts§ 46[1][1965].

**SECOND CAUSE OF ACTION**
**#2 Fraud**

(049) See Statement of Facts: (018), (019), (020), (021), (022), (023), (026), (027), (028), Also see TAB #4: Decision of Judge Frank Roesch in his ORDER GRANTING MOTION FOR SANCTIONS against Lonnie Finkel and Finkel Law Group dated August 23, 2024.

(050) For Civil Code Section 1572 California Code Sets Forth Elements of Fraud. Misrepresentation of a material fact; Knowledge of falsity, or acted recklessly; Intent to deceive; Justifiable reliance; Resulting harm or detriment.

**THIRD CAUSE OF ACTION**
**#3 Federal Law Prohibited Transactions via Interstate Commerce**

(055) See Statement of Facts: (004), (005), (006), (008), (013), (015), (017), (019), (020), (022), (023), (024), (025), (026), (027), (028), (030), (031), (032), (033), (034), (035), (036), (037), (038), (039), (040), (041), (042), (043), (044), (045).

**(056) 18 U.S. Code § 1962 - Prohibited activities**

**(c)** It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or ***collection of unlawful debt.***

(057) 18 USC §1964. Civil remedies

(a) The district courts of the United States shall have jurisdiction to prevent and restrain violations of section 1962 of this chapter by issuing appropriate orders, including, but not limited to: ordering any person to divest himself of any interest, direct or indirect, in any enterprise; imposing reasonable restrictions on the future activities or investments of any person, including, but not limited to, prohibiting any person from engaging in the same type of endeavor as the enterprise engaged in, the activities of which affect interstate or foreign commerce; or ordering dissolution or reorganization of any enterprise, making due provision for the rights of innocent persons.

(c) Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover ***threefold the damages*** he sustains and the cost of the suit, including a reasonable attorney's fee.

/

/

**IX. Part 3 Prayer for Relief by Plaintiff Gloria Malesardi**

I am not a lawyer, so I don't know the precise legal terms for my claims against Lawyer Lonnie Finkel, or the appropriate remedies but let me attempt to present them.

WHEREFORE, Plaintiffs' pray for judgment as follows:

1. Lonnie Finkel's intentionally tortious threats, harassments, extortions and outrageous conduct toward me in both California and New York have caused and continue to cause, great emotional trauma, and created fear for my safety. I am asking the Court to tell Lonnie Finkel that he has caused me a $1,000,000 emotional and physical damage.
2. Pursuant to 18 U.S. Code Section 1964 three times my emotional and physical damage for an additional $3,000,000.
3. Because Lonnie Finkels' intentionally tortious threats, harassments, extortions and outrageous conduct toward me in both California and New York over many, many months were not isolated...but were ongoing over many months and were intended to cause me great physical and emotional trauma…which will be with me for years to come...I am asking for a punitive damage against Lonnie Finkel of $5,000,000.
4. The court enter judgment for Plaintiff.
5. The court award Plaintiff all costs of suit incurred herein.
6. The court award such other and further relief as it deems just and proper.

Dated: March 6, 2026

Respectfully submitted,
Gloria Malesardi

Gloria Malesardi

Gloria Malesardi

# TAB #1

FINKEL Law Group

July 22, 2021

*VIA ELECTRONIC & U.S. MAIL*

Ms. Gloria Malesardi
2263 5th Street
East Meadow, NY 11554

**Re: Engagement for Legal Services**

Dear Ms. Malesardi,

Finkel Law Group P.C. ("Firm") is pleased to have the opportunity to represent the Estate of Steven Malesardi ("Estate") and I Fix Things LLC ("Company") in the legal dispute they are involved in with Colleen and Sean Broderick ("Plaintiffs") presently pending in Alameda County Superior Court (Case No. HG-21103647) over the contract for renovations to the Plaintiffs' residence in Berkeley, California. We understand that you are the personal representative of the Estate and the person authorized to act on behalf of the Company, and thus we are sending this engagement letter to you.

Please excuse the formalities of this letter, but we are required to have written agreements with our clients. This letter sets forth the terms of our engagement as your attorneys. Please read the letter carefully before you sign and return it to us with the required retainer. If you do not understand any portion of the letter or have any questions, please call me to discuss them.

We will attempt to resolve this matter through negotiation and mediation. In the event we cannot do so, we will provide the Estate and Company with the legal services reasonably required to represent them in a judicial proceeding that takes place in the state or federal courts of California, or an arbitration proceeding that takes place in California, to resolve the matter described above. We will continue to represent the Estate and Company until a settlement or judgment is reached or we withdraw as their attorneys under the terms of this letter. Should the matter proceed through trial, we will oppose any motion for a new trial or other post-trial motions filed by the opposing parties. After judgment, we will not represent the Estate or Company on any appeal or proceeding designed to execute on any judgment obtained on their behalf unless you and the Firm agree on such additional representation in a separate written engagement letter.

The Estate and Company will be responsible for all of the Firm's fees and charges. We will bill monthly for our services based upon the time spent on the matter, and will send those bills to your attention unless directed otherwise. In addition, the Estate and Company will reimburse us for all disbursements paid to third party suppliers and service providers immediately upon request.

I will be the supervising attorney in charge of your case. My hourly rate for this engagement is $550. I may be assisted by various other attorneys and legal assistants depending on my determination of the work and expertise required for a particular matter. Our time will be billed at our normal hourly rates, which for attorneys currently range from $500 to $600 per hour depending upon the experience and expertise of the attorney performing the services. The hourly rates for our legal assistants and paralegals who may perform services in this matter range from $125 to $195. We record all time for our professionals in minimum increments of 0.10 hours or 6 minutes. If our normal hourly rates change, services provided after the date of the change will be provided at the then current hourly rates. We generally review our rates once a year. We will provide you with 30 days' notice of any changes.

In addition to paying all of the Firm's fees and charges, the Estate and Company agree to pay all requested retainers and maintain a minimum balance in the Firm's trust account during the engagement. An initial retainer of $5,000 is due upon your acceptance of this agreement. You agree to maintain a minimum balance of no less than $5,000 in the Firm's trust account during the entire engagement. In the event the matter requires us to participate in a trial or arbitration, you agree to pay us an additional monthly retainer in an amount we determine is sufficient to pay all fees and costs incurred to prepare for and participate in a trial or arbitration before a state or federal court or arbitrator in California. All retainer amounts you pay to us will be deposited into the Firm's trust account and will be credited against our hourly fees and costs. We will provide you with a regular accounting of the trust account activities that apply to your matter. We will withdraw funds from the Firm's trust account as services are rendered and costs incurred.

You agree to grant the Firm a lien as security for the payment of fees and costs due and owing to us under this agreement. The lien will attach to any recovery the Estate or Company may obtain in this matter. The lien could delay payments to you or receipt by you of some or all of any recovery you may obtain as a result of our services until any dispute over the amounts to be paid to us is resolved. You may seek the advice of another attorney about whether to agree to this lien provision and its consequences. By signing the agreement you acknowledge that you have been advised of the terms of the lien, the right to consult independent counsel, and that you have been given a reasonable opportunity to seek such legal advice.

We may use lawyers who are independent contractors in our representation of you, for whose work we will charge the same hourly rates as described above. To effectively represent the Estate and Company in this matter it may be necessary to retain expert consultants or investigators. We will not hire these individuals without your prior consent. If you consent to their hiring, the Estate and Company will be responsible for all charges incurred by us for any work conducted by these individuals.

From time to time, we may be asked to provide estimates. Estimates are just that, estimates. Because of the number and complexity of issues in each matter, it is difficult to provide precise estimates. Accordingly, unless we otherwise specifically agree in writing, our statements will be based upon time actually spent on your matter and will not be limited by any estimate we may have given.

In addition to our hourly charges, we will bill for all charges incurred on your behalf, including messenger services, court reporters, certification and filing fees, legal research services, copying, word processing, mailing, travel, accommodations, tolls, long-distance telephone calls, facsimile transmissions, and the like. A list of the Firm's current disbursement charges is attached. Our monthly bill will be itemized to describe the specific services provided and costs incurred. For larger items, we may ask you to pay the vendor directly. Payment on all statements is due upon receipt. Statements outstanding more than 30 days will be subject to a carrying charge of 12 percent per annum on the unpaid balance.

We encourage you to question any entry or charge that does not appear appropriate and we will work with you to resolve your concerns. We do ask that you do so in a timely manner so that the issue may be addressed while the facts are ascertainable and memories are fresh. In the event of any dispute, you agree to timely pay the undisputed amount of the statement.

We look forward to a productive and enduring working relationship. To ensure such a relationship, we rely on you to provide us with accurate information at all times during the representation. You agree to be completely truthful with us, to cooperate with us, to keep us fully informed of developments, and to abide by this engagement letter, including promptly paying our bills for services and costs. Your cooperation includes keeping us informed of your whereabouts and agreeing to appear when necessary for meetings, settlements and other conferences.

We will always provide you with candid legal advice about your matter. That said the rules of professional conduct prohibit us from making any representations or warranties about the successful outcome of a matter. All of our statements concerning your matter, and all of our work on the matter, are statements of opinion that you may not rely on as though they are representations or warranties of fact.

You may terminate our engagement by written notice at any time. Your decision to terminate the engagement does not affect your obligation to pay all legal fees due and owing at the time of termination, and all costs previously incurred or advanced by us on your behalf. We may terminate the engagement if you fail to comply with the terms of this letter, and as required or permitted by the rules of professional conduct. When our services conclude, all unpaid charges are immediately due and payable. When our representation concludes we will retain at your expense one copy of all files we have maintained for its matters.

We rarely have disagreements with our clients that cannot be resolved by amicable discussion. In the event we do, however, we agree that any dispute between us that cannot be resolved informally and pertains to our legal fees or other charges will be submitted to non-binding arbitration conducted under the rules of the Bar Association of San Francisco and the California Code of Civil Procedure. We agree the arbitration will be conducted in San Francisco, California.

Any dispute that arises between us that concerns issues other than our attorneys' fees and charges, including any claim of malpractice, breach of fiduciary duty or other act or omission, must be resolved by binding arbitration in San Francisco before a single arbitrator of JAMS/Endispute or a similar dispute resolution service in accordance with the JAMS/Endispute Streamlined Arbitration Rules or similar rules used by the alternate dispute resolution service. All discovery will be governed by the applicable provisions of the California Code of Civil Procedure. If any action is commenced to enforce this agreement or any right arising under the agreement, including the collection of legal fees, the prevailing party is entitled to recover from the other party, the reasonable attorney's fees, costs, and expenses incurred by the prevailing party to prosecute the action.

Please acknowledge acceptance of the above terms by signing and dating where indicated below. Keep a copy for your records and mail the original to our office so we can place it in your file. We will begin work on your matter once we receive the executed agreement and the initial retainer. We look forward to working with you. If you have any questions, please call me at (510) 344-6601.

Very truly yours,

FINKEL LAW GROUP, P.C.

Lonnie Finkel, Esq.

**Agreed to and accepted on behalf of:**
Estate of Steven Malesardi

Sign: Gloria Malesardi
Name: Gloria Malesardi
Title: Gloria Malesardi Per. Rep.
Date: July 23, 2021

**Agreed to and accepted on behalf of:**
I Fix Things, LLC

Sign: Gloria Malesardi
Name: Gloria Malesardi
Title: Gloria Malesardi Per Rep
Date: July 23, 2021

**Finkel Law Group, P.C.**

**Disbursement Charges Effective January 1, 2021**

A. Costs incurred internally by Finkel Law Group, P.C. are charged as follows:

1. Automated legal research services, at the cost invoiced by the vendor.
2. Couriers and delivery services, at the cost invoiced by the vendor.
3. Facsimile transmissions, at $1 per page for outgoing and no charge for incoming.
4. Photocopies, at 20¢ per page.
5. Postage, at actual cost.
6. Telecommunications, at the cost invoiced by the vendor for itemized transactions.
7. Word processing, at actual cost.
8. Overtime work required of support staff, at actual payroll cost.
9. Travel and accommodations, at actual cost or cost permitted by I.R.S.
10. All other charges, at actual cost.

B. Significant costs incurred on behalf of clients to outside vendors will be invoiced directly to the client by the outside vendor whenever feasible, particularly for items that exceed $250.

# TAB #2

JUNE 4, 2024
LF VERBALLY ASSAULTED ME
LF YELLED: "F*** OFF, F*** YOU, F*** YOU", ABRUPTLY GRABBED AND PICKED UP HIS PHONE AND PAD OF PAPER, SLAMMED THEM ON THE TABLE THEN PICKED UP HIS THINGS AND STORMED OFF TOWARDS COURT, ABOUT 12-15 STEPS DOWN THE STREET LF TURNED AROUND, STARTED TO STEP BACK AT ME AND STARTED YELLING AT ME WHILE HE WAS POINTING HIS FINGER AT ME DRAWING HIS HAND BACK AND POINTING AGAIN 2-4 TIMES, "I AM GOING TO SUE YOU FOR EVERYTHING." TURNED AROUND AND WALKED BRISKLY BACK TO COURT. When LF used profanity it was offensive, inappropriate, disrespectful, unprofessional and made me fear for my safety. It was when LF threatened me I started to have a panic attack. I am worried he is going to follow me or send someone to collect money from me, I am worried for my safety.

GM walked in the opposite way of courthouse and walked up some steps to an apartment building on the next block from deli, sat on the steps in the shade. Called KB office and spoke with SM. SM said to call KB now KB is on lunch break. Called KB and told him what happened. KB had to go back to his class. Called SM back, I could stay on the phone with her, made me feel not so isolated. SM said go back to the deli and see if they have security cameras. With SM on the phone, I went into the deli. The gentleman who runs the deli was behind the register, he was looking at me with a face that he knew something was wrong. (approx. 1:10 PM PT) GM asked him if he had security cameras. Deli asked what happened. GM told him there was an episode with someone outside (I did not mention anyone by name). Deli asked if I was ok, and I said yes. Deli told me he did not own the building but brought me next door to show me a sign with the phone number for the building manager. I took a photo on my phone and texted the photo to SM. SM received it before I left the building. Went out the front door of the building, not back threw the deli. SM said to go to courthouse security once I am back at the Court. Went in the front door of the Court and one of the security guards I would greet often was at the x-ray machine. I asked him if I could speak with him and motioned to him with my hand to come over towards me. Security said what's wrong. I asked him to come over towards me again motioning with my hand to come over, security said what do you need and said to step over towards him. GM said to security I am in a lawsuit upstairs and I had an episode with someone from the case and if I needed security could I come to them at the front door to help me. Security said yes and what did I want them to do? GM said I

would call for a car service and needed security to get into the car out in front of the CH. Security said we can help you inside the building but we cannot do anything outside the door. I said that would be fine as long as I could stand by security until the car service arrived. He said yes. I went through the security booth and upstairs by way of the stairway. After I exited the stairway and through the double doors to the hallway outside the courtroom LF was coming in the opposite side double door entrance and aggressively walked straight over towards me in a hostile manor and asked "I just want to confirm if what you said earlier, would paying TG 9K before he got on the stand and the other two open invoices when he got off the stand tomorrow". I stated I would honor my commitment with TG as I stated earlier. (which my statement was - 9K before and the balance of two invoices when he completed his testimony, whatever that day was). LF and I entered the Court. I sat down and LF slammed an envelope in front of me on the desk, another aggressive gesture, I picked up the envelope and put it in my knapsack.

Michael Northover was on the stand. MN finished his testimony and jury questions approx. 4:36 PM PT. LF had to do jury questions with JR and needed to stay. GM asked LF if he had to stay, LF answered yes. I took my belongings and exited the Court room. As I was exiting the door there where two armed security guards outside the Court doors. One man and one woman. (I thought LF was having me arrested) I walked out and filled my water bottle. CB walked into the Court and asked security guards what's going on, SG I believe said nothing we are just here, CB is everything okay SG said yes.
GM exited Court and got on the elevator with jurors (crochet and smiles, some others and MN, MN asked the jurors about a missing juror, released). Exited elevator on the first floor and was walking out when MN called "Ms. Malesardi" then again "Ms. Malesardi, can I talk to you". Gave his condolences for SJM, he was a Yankee fan, MN is a Yankee fan, SJM always wore a Yankee hat. Broderick's are good people. CB had a stroke at 35 and could not work as a teacher anymore. Broderick's then adopted two special needs children from Mexico. MN sorry GM had to go through this after the loss of my brother. MN thought this would have settled, it should have never gone to this. It's the lawyers who get everything and all of the estate is gone and GM gets nothing. Walked out of the building talking with MN, got to corner and went in a different direction.
I went back to the hotel in a panic as fast as I could walk. I was on the phone the entire way not to be alone. I could yell and the person on the phone could hear

me if someone was following me and or tried to hurt me. Arrived back at the hotel and locked the door and shut the blinds, I was afraid to look out the window in fear someone had followed me.

June 5, 2024 Went to courthouse and walked in at 9AM PT. did not want another confrontation. Had lunch on an upper floor of the courthouse. Did not want to leave during the day, did not feel safe. KB suggested not to leave the building during the day. At the end of the day exited the courthouse and hurried back to the hotel room as fast as I could. Had my friend on the phone in case someone confronted me on my way back to the hotel, I was petrified. Stayed in the hotel room with curtains closed.

# TAB #3

The State Bar of California

**Date:** 1/7/2025

# Attorney Misconduct Complaint

## Your Contact Information

| | | |
|---|---|---|
| **Title:** | | |
| **First name:** Gloria | **Middle name:** M | **Last name:** Malesardi |
| **Address:** 2263 Fifth Street | | |
| **City:** East Measow | **State:** NY | **ZIP code:** 11554 |
| **Email:** globird@me.com | | |
| **Your telephone numbers:** | | |
| **Home:** (516) 735-2412 | **Work:** | **Cell:** (516) 735-2412 |

## Attorney's Information

| | | |
|---|---|---|
| **First name:** Lonnie | **Middle name:** | **Last name:** Finkel |
| **Address:** Ste 1800 1999 Harrison St | | |
| **City:** Oakland | **State:** CA | **ZIP code:** 94612 |
| **Email:** lfinkel@finkellawgroup.com | **CA Bar License #:** 196487 | |
| **Primary phone:** (510) 344-6601 | **Other phone:** | |
| **Cell phone:** (925) 998-3394 | **Website:** http://www.finkellawgroup.com | |

**Have you or a member of your family complained to the State Bar about this attorney previously?**

○ Yes ⦿ No

**Did you hire the attorney?**

⦿ Yes ○ No

**Does this complaint involve allegations of theft or misappropriation of funds?**

○ Yes ⦿ No

**Does this complaint involve allegations of attorney misconduct against a person 65 years of age or older?**

⦿ Yes ○ No

**Does this complaint involve allegations of attorney misconduct against a person who is incapacitated, infirm, disabled, incarcerated, an immigrant, or a minor?**

○ Yes ⦿ No

**Does this complaint involve allegations that the attorney has abandoned a client?**

The State Bar *of California*

**Date:** 1/7/2025

## Attorney Misconduct Complaint

(•) **Yes** ( ) **No**

**Are you an attorney?**

( ) **Yes** (•) **No**

**Enter the approximate date you hired the attorney and the amount, if any paid to the attorney.**

**Date:** 7/23/2021 **Amount paid:** $599,479.23

**What is your connection with the attorney? Explain briefly.**

**Statement of Complaint**

**Include with your submission a statement of what the attorney did or did not do that is the basis of your complaint. Please state the facts as you understand them. Do not include opinions or arguments. If you hired the attorney(s), state what you hired the attorney(s) to do. Additional information may be requested.**

The State Bar *of California*

Date: 1/7/2025

# Attorney Misconduct Complaint

As Executor to the Estate of Steven Malesardi the Client hired Lonnie Finkel of Finkel Law Group to defend a lawsuit in Alameda County for a home renovation by the Defendant Decedent, a Design Professional. Plaintiffs Initial Creditors Claim was $350,000.00. The retainer agreement was in writing, signed on July 23, 2021.
Retainer agreement attached.

Mr. Finkel delayed and prolonged litigation with unfounded claims in the Estates multiple Cross Complaints which Alameda Court Civil Judge Frank Roesch based his sanctions order of $302,000.00 against Lonnie Finkel, dated August 23, 2024.
Sanctions order attached.

Additional examples of Mr. Finkel's behavior; Mr. Finkel received several orders of sanctions in the case of "Fang vs Tom".
Sanctions orders attached.

Mr. Finkel used overlitigation and improper billing for unfounded cross complaints and discovery. Drafting cross complaints against professionals then withdrawing the draft before filing the complaint. Excessive motions,
depositions, drafting cross complaints, and multiple postponements of the trial delayed the resolution of the case and increased the cost of litigation. The Client timely paid all invoices as presented, approximately $641,000.00 until the Estate became insolvent.

Mr. Finkel failed to communicate with his Client when the Estate received an unfavorable outcome in court. Failed to provide copies of documents including motions, sanctions petition, hearings and answers after several requests. Mr. Finkel failed to provide his Client responses to questions and backup to charges on Finkel Law Group invoices.

Mr. Finkel used unethical behavior when he demanded his Client file a Cross Complaint against a party in the lawsuit. When his Client would not agree to file a new complaint, Mr. Finkel screamed with insults and profanity threatening he would leave as counsel unless his Client consented.

Mr. Finkel misrepresented his Client in settlement discussions. From August 2021 to January 2023 the Client paid Finkel Law Group approximately $154,000.00. In December 2022 the Client proposed several settlement
offers for the plaintiffs. Mr. Finkel strongly opposed the settlement offers. Mr. Finkel stated he would never charge his Client $120,000.00 to finish the trial; the amount of money the plaintiffs would accept to settle the case. Mr. Finkel additionally stated; at the conclusion of trial the Estate would receive back the attorney fees paid to Finkel Law Group. From January 2023 to the end of trial the Client was additionally invoiced over $862,000.00; more than seven times the amount Mr. Finkel stated his Client would never be charged to finish
the trial, which is also invoiced more than seven times the amount the Client would have paid the plaintiffs to settle the case. In total the Client has been invoiced over ONE MILLION dollars for this lawsuit.

Mr. Finkel petitioned the court to withdraw as attorney after 20 days of a jury trial and two days before closing arguments. Judge Roesch denied Mr. Finkel's request to withdraw.

Mr. Finkel was to advocate for his Client to receive invoice adjustments from a poor performing expert witness. Mr. Finkel stated "I am not your advocate, I will not advocate for you, unless you pay me".

Mr. Finkel filed an appeal to a fair settlement agreement without his Clients prior authorization.

Mr. Finkel demonstrated unprofessional and abusive behavior when Mr. Finkel verbally assaulted his Client outside the Alameda courthouse during a lunch break at the civil trial. Mr. Finkel used ridicule, offensive profanity and violent gestures threatening he would sue his Client. When Mr. Finkel did not like his Clients response to a situation he would yell, use profanity, make threats and hang up the phone.

The State Bar *of California*

Date: 1/7/2025

# Attorney Misconduct Complaint

## Related Court Case Information

| | |
|---|---|
| **Court name:** Superior Court of CA County of Alameda | **Case name:** Broderick v G Malesardi as Executor, Agim Bekiri |
| **Case number:** HG21103647 | **Approx. date case was filed:** 5/21/2021 |
| **Size of law firm complained about** 1 Attorney | |
| **If you are not a party to this case, what is your connection with it? Explain briefly.** | |

## Attachments

☐ **No files attached**

- Lonnie Finkel Retainer Agreement 7.23.2021 1 of 2.pdf
- Lonnie Finkel Retainer Agreement 7.23.2021 2 of 2.pdf
- Order_Granting_Motion_for_Sanctions on LONNIE FINKEL 8.23.24 pdf copy 1 of 2.pdf
- Order_Granting_Motion_for_Sanctions on LONNIE FINKEL 8.23.24 pdf copy 2 of 2.pdf
- SANCTION - Hayward FANG v TOM (Lonnie Finkel).pdf

## Translation Information

☐ **Not applicable**

**The State Bar accepts complaints in over 200 languages. If you need translation services to communicate with the State Bar, please let us know by completing this section of the complaint form. We will communicate with you through a translation service in the language of your choice. Do you need translation services?**

○ **Yes** ⦿ **No**

**State the language in which you need formal translation:**

The State Bar *of California*

# Attorney Misconduct Complaint

**Date:** 1/7/2025

## Submission

☑ **By checking this box I certify that all information on this form is true and correct. I understand that the content of my complaint can be disclosed to the attorney. I understand that I waive the attorney client privilege and any other applicable privilege between myself and the attorney to the extent necessary for the investigation and prosecution of the allegations. I also agree that the checkbox and my name typed below are to be used as my electronic signature.**

☑ **I understand that if the Office of Chief Trial Counsel (OCTC) prosecutes allegations contained in this complaint, I may be required to testify before the State Bar Court in order to prove the charge or charges or misconduct against the above-named attorney.**

☑ **I understand that every person who reports to the State Bar or causes a complaint to be filed with the State Bar that an attorney has engaged in professional misconduct, knowing the report or complaint to be false and malicious, is guilty of a misdemeanor.**

**Signature** Gloria Malesardi

# TAB #4

FILED
ALAMEDA COUNTY
AUG 28 2024
CLERK OF THE SUPERIOR COURT
By ______ Deputy

SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF ALAMEDA

| | |
|---|---|
| COLLEEN BRODERICK and SEAN BRODERICK,<br>Plaintiffs,<br>Vs<br>GLORIA MALESARDI, as Executor of the Estate of STEVEN MALESARDI, I FIX THINGS, LLC., AGIM BEKIRI, DOE 1 THROUGH DOE 10,<br>Defendants.<br>I FIX THINGS, LLC. and GLORIA MALESARDI, as Executor of the Estate of STEVEN MALESARDI,<br>Cross-complainants,<br>Vs<br>COLLEEN BRODERICK and SEAN BRODERICK,<br>Cross-defendants. | Case No. HG21103647<br><br>ORDER GRANTING MOTION FOR SANCTIONS PURSUANT TO CCP § 128.7 |

The motion for sanctions by plaintiffs and cross defendants Sean and Colleen Broderick against Lonnie Finkel and his law firm, Finkel Law Group pursuant to section 128.7 of the Code of Civil Procedure came before the court on June 27, 2024. At that time the court, sua sponte, continued the matter to afford Mr. Finkel, the responding party, an opportunity to provide more than the unsupported conclusory averments in his declaration in opposition.

Further declarations have been received from both the moving party and the responding party and the matter was argued on August 1, 2024. Present were Jivaka Candappa, Esq., for the moving parties, Colleen Broderick and Sean Broderick, and David McMonigle Esq., along with his client, responding party, Lonnie Finkel.

The matter was argued and submitted, and the court took the matter under submission.

After careful consideration of all the papers filed in support and in opposition to the motion, judicial notice of pleadings and documents in the court's file, and information learned in the course of the hearing the court rules as follows.

Plaintiffs/Cross-Defendants Colleen Broderick and Sean Broderick's (moving parties) motion for the imposition of sanctions on Lonnie Finkel and Finkel Law Group (responding party) is GRANTED as detailed in this Order.

TIMELINESS OF MOTION

It was correctly pointed out that the court had already adjudicated the merits of the purportedly frivolous pleadings prior to the actual filing in court of the motion for sanctions, however, while the motion was filed with the court on March 19, 2024, it was

served by personal service to responding party's law office on February 22, 2024. The Broaderick's motion for summary judgment was heard on March 14, 2024, twenty two days later counting the day of service and the day of hearing. The motion for summary judgment was taken under submission on March 14, 2024 and the order granting the motion for summary judgment was signed and issued seven days later on March 21, 2024.

The relevant law on this procedural issue is stated in *Li vs. Majestic Industry Hills LLC (2009) 177 Cal App 4th 585* as follows:

"A party seeking sanctions under sections 128.5 or 128.7 must follow a two-step procedure. (*Transcon Financial. Inc v Reid & Hellyer, APC (2022) 81 Cal. App. 5th 547,550.*) First, the moving party must serve on the offending party a motion for sanctions. (*Ibid.*) Service of the sanctions motion triggers the 21- day safe harbor period during which the moving party may not file the motion. (*Ibid.*) That is because the offending party may avoid sanctions by withdrawing the challenged pleading during the 21-day period. (*Ibid.*) Second, if the offending party does not withdraw the challenged pleading during the period, then the moving party may file the sanction motion. (*Ibid.*)

Specifically, section 128.7 provides that a notice of motion for sanctions "shall be served as provided in Section 1010 but shall not be filed with or presented to the court unless, with 21 days after service of motion, or any other period as the court may prescribe, the challenged paper… is not withdrawn[.]" Code Civ. § 128.7, subd. (c ) (1).)

The purpose of the safe harbor period is to allow a party to withdraw an objectionable document and thereby conserve judicial resources as well as save the parties the time and expense of litigating sanctions. (*Broadcast Music, Inc., supra, 75 Cal. App. 5th at p. 605.*) The statute is remedial, not punitive. (*Ibid.*) Therefore, a sanctions motion cannot be filed until the 22nd day after service of the motion, i.e., after the 21-day safe harbor period expires. (*Ibid.*)

However, sanctions are unauthorized if the court adjudicates the merits of the objectionable document either during or prior to the safe-harbor period. (*Broadcast Music, Inc., supra, 75 Cal. App. 5th at p. 605.*) This is because once the court resolves the merits of the document, there is nothing left to correct or withdraw, which "undermin[es] the remedial purpose of the safe harbor provision." (*Li v. Majestic Industry Hills LLC (2009) 177 Cal. App. 4th 585, 594.*)

The law requires strict compliance with the safe harbor provisions. (*Li v. Majestic Industry Hills LLC (2009) 177 Cal. App. 4th at p. 593.*) Failure to comply with the safe harbor provisions precludes an award of sanctions. (*Transcon Financial. Inc v Reid & Hellyer, APC (2022) 81 Cal. App. 5th at p. 551.*)

It appears that service of the motion on responding party provided a sufficient "safe harbor" time to the responding party prior to the hearing on the Motion for Summary Judgment and prior to the court's ruling a week after the hearing (CCP § 128.7 subd (c)(i), (*Broadcast Music, Inc., v. Structured Asset Sales, LLC (2022) 75 Cal. App. 5th 596, 605.*)

THE MERITS OF THE MOTION

Code of Civil Procedure section 128.7 mandates, inter alia, that:

(b) By presenting to the court, whether by signing, filing, submitting, or later advocating, a pleading, petition, written notice of motion, or other similar paper, an attorney … is certifying that to the best of the person's knowledge, information, and belief formed after an inquiry reasonable under the circumstances, all of the following conditions are met:

(1) It is not being presented primarily for an improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation.

(2) The claims, defenses, and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law.

(3) The allegations and other factual contentions have evidentiary support or, if specifically, so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery.

(4) The denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on lack of information or belief.

CCP section 128.7 goes on to mandate, that:

(c) If, after notice and a reasonable opportunity to respond, the court determines that subdivision (b) has been violated, the court may, subject to the conditions stated below, impose an appropriate sanction upon the attorney, law firms, or parties that have violated subdivision (b) or are responsible for the violation. In determining what sanctions, if any, should be ordered, the court shall consider whether a party seeking sanctions has exercised due diligence.

(d) A sanction imposed for violation of subdivision (b) shall be limited to what is sufficient to deter repetition of this conduct or comparable conduct by others similarly situated. Subject to the limitation in paragraphs (1) and (2), the sanctions may consist of, or include, directives of a nonmonetary nature, an order to pay a penalty into court, or if imposed on motion and warranted for effective deterrence, an order directing payment to the movant of some or all of the reasonable attorney's fees and other expenses incurred as a direct result of the violation.

(e) When imposing sanctions, the court shall describe the conduct determined to constitute a violation of this section and explain the basis for the sanction imposed.

Here, the responding party authored, signed, filed, and advocated a cross-complaint against the moving partes whose final iteration, the Third Amended Cross-Complaint (TACC), was ultimately disposed by summary judgment. The TACC (and its predecessor iterations) was replete with factual allegations that are and were totally unsupported by evidence or any information upon which any objectively reasonable attorney could rely. The factual allegations in the TACC are not only unsupported by any objectively reasonable evidence, but all the evidence available to Mr. Finkel at the time that he authored, signed and filed the TACC regarding those allegations was contrary to

the allegations. There is no specific identification in the TACC of any allegation in the TACC (or its predecessors) that such allegation of fact is likely to have evidentiary support after a reasonable opportunity to investigate and or conduct discovery.

It is the court's determination that the TACC (and its predecessors as well) was filed with the purpose of harassing the moving parties by needlessly increasing their cost of litigation and by unnecessarily delaying the resolution of the case. The evidence presented further supports the moving parties assertion that the TACC (and its predecessors) was filed to create a billing opportunity in order to enrich the responding party at the expense of both the moving parties and of his own client.

THE PLEADING

There is no dispute that responding party, Lonnie Finkel of the Finkel Law Group, P.C., presented to the court the Third Amended Cross-Complaint herein. It is not contested that he authored it, signed it, filed it and advocated for it.

The Third Amended Cross Complaint contained a number of claims against the moving parties. The claims of fraud, among others, against the moving parties had first been asserted, based on many of the same allegations of fact, in the Cross-Complaint, the First Amended Cross-Complaint and the Second Amended Cross-Complaint and those were superseded by the filing of the final iteration of the claims in the TACC.

The declaration in support of the motion motion attaches the TACC to the motion as an exhibit and identifies, by the highlighting of text in the exhibit, the allegations the moving parties assert are frivolous and made without any factual support. The moving

parties assert in the motion that the allegations were not based on any credible information or documents.

1) The First Purportedly Unsupported Allegation

The first (in the order alleged in the TACC) such allegation was the allegation of fact found in paragraph 12 of the TACC. The highlighted allegation in paragraph 12 states:

"Malesardi never represented himself to the Brodericks as a licensed architect. He, in fact, disclosed to them that he was not a licensed architect and was not registered with the California Architects Board. He also explained to them that preparation of the plans, drawings and specifications for the renovations to their single-family, single-story wood frame residence did not require a licensed architect under California law. Mr. Malesardi also informed the Brodericks that even though a licensed architect is not required to prepare the plans, drawings or specifications for their residential remodel, E. Michelle Murata, who was and is a licensed architect, would prepare the plans, construction drawings and specifications for the renovation of their residence. Mr. Malesardi further told the Brodericks that he would not serve as the general contractor for their project nor provide construction management services. He would simply provide construction observation services to assure the project was being constructed in general compliance with the design. He informed the Brodericks that they were responsible for securing their own general contractor and providing their own construction management. With all of these facts disclosed to, and clearly understood by, the Brodericks they agreed to enter into the Contract with the Company for Mr. Malesardi and other professionals to provide the design and construction observation services stated in the Contract, and nothing more."

No evidence or information upon which one could reasonably rely has ever been produced to support the assertions of fact found in this paragraph. That is, that Mr. Malesardi "disclosed," "explained" "informed" and /or "told" the moving parties any of the facts alleged in this narrative.

Mr. Finkel, the responding party, in his Declaration in opposition to this motion states "when I filed the TACC I had evidentiary support for each of the factual contentions identified by cross-defendants in Paragraph 12, or I had a good faith belief I would discover evidence to support the contentions after a reasonable opportunity to conduct further investigations."

It is worthy of note, that CCP § 128.7 mandates that the responding party, in signing and filing the TACC was certifying that to the best of the [responding party's] knowledge, information, and belief, formed after an inquiry reasonable under the circumstances the allegations and factual contentions have evidentiary support or "if specifically so identified, are likely to have evidentiary support" after a reasonable opportunity for further investigation or discovery. So, while the responding party may assert in his defense the disjunctive "or I had a good faith belief I would discover evidence to support the contentions after a reasonable opportunity to conduct further investigations," that is a meaningless defense to the motion because the TACC does not specifically identify any factual allegation or contention in the entire TACC as one falling into that category.

The responding party asserts in his declaration that the allegations in paragraph 12 consisting of what Mr. Malesardi affirmatively stated to the Brodericks are supported by the following information or evidence.

1. Mrs. Broderick's deposition testimony.
2. The contents of the IFT contract.
3. Mr. Broderick's deposition testimony.
4. The Michelle Murata Deposition.

5. The architectural drawings of the project including that the initials EMM are on the drawings.

A review of such proffered "evidence" makes it absolutely clear that none of the cited evidence or information is actually supportive of any allegation that Mr. Malesardi made any representation at all to Mrs. Broderick much less the specific allegations alleged. Mr. Finkel states that he evaluated Mrs. Broderick's deposition testimony on whether Steven Malesardi told her he was a license architect as "evasive and deceptive" and determined from her testimony that Mr. Malesardi inferred that he was an architect without actually stating it, that her testimony "was nothing more than willful blindness which equals to knowledge." On its face, and even if Mr. Finkel truly had such a belief, this information does not support an allegation that Mr. Malesardi affirmatively told Mrs. Broadrick that he was not an architect and that he was not registered with the California Architect's Board. Mr. Finkel's argument that it is not objectively unreasonable to allege these facts in a Cross-Complaint is an argument utterly without merit.

Mr. Finkel's argues that Mr. Broderick's deposition testimony that he did not research if Mr. Malesardi was actually a licensed architect appeared to Mr. Finkel as evasive and deceptive. Mr Finkel contends that Mr. Broaderick's deposition testimony thus supports the allegation of fact that Mr. Malesardi told Mr. Broderick that he, in fact, was not a licensed architect even though he contracted to provide architectural services. Such an evaluation by Mr. Finkel, if it truly was his evaluation, could not function as information or evidence from which an attorney could reasonably deduce that Mr. Malesardi made the alleged statement.

The evidence that Mr. Malesardi informed Mrs. Broderick that her project did not require a licensed architect is based on Mr. Finkel's conclusion that Mrs. Broderick must have known that a license was not required. The conclusion that Mrs. Broderick must have known that a license was not required is based, apparently, on the fact that a Berkeley Zoning Permit Application form states, inter alia, that an architect's stamp is required on each page of architectural drawings whenever prepared by a licensed architect along with some examples of when an architect's license is required.[1]

The next statement alleged to have been made by Mr. Malesardi is that he told the Brodericks that Michelle Murata was a licensed architect and that she would be preparing all the plans, etc.

Mr. Finkel apparently deduced that Mr. Malesardi made such statement from Mrs. Broderick's deposition testimony that she did not discover that Ms. Murata was an architect until after the Contractors State Licensing Board cited Mr. Malesardi and Mr. Bekiri, and that she had been of the belief up until then that Ms. Murata was no more than Mr. Malesardi's assistant. Mr. Finkle concluded that "except for her [Mrs. Broderick's] willful blindness, she must have known Ms. Murata was an architect…"

But the allegation in the cross-complaint is not that Michelle Murata is an architect, rather it is that Steven Malesardi told the Brodericks that she was a licensed architect at a point in time prior to the formation of any contract between I Fix Things

[1] While Mr. Finkel states that "the application materials clearly state the Broderick's project does not require a licensed architect," that is not so. Instead, a reader of a list of examples of when an architect's license is required may or may not deduce that an architect's license would therefore not be required if none of the examples apply.

(Mr. Malesardi's LLC) ("IFT") and the Brodericks. It is entirely unclear to the court how Mr. Finkel could conclude that Mr. Malesardi informed Mr. and Mrs. Broderick that Michelle Murata was the architect at the time of formation of the IFT contract when Mr. Finkel claims that the Brodericks should have deduced that she was an architect from acts on her part, like her initials printed on architectural drawings or her measuring the existing building, events that happened later in time than the formation of the IFT contract.

It is clear to this court that none of the "evidentiary support" cited in opposition to this motion can establish an objectively reasonable basis to allege the facts alleged in paragraph 12 of the TACC.

2) The Second Purportedly Unsupported Allegation

The second highlighted portion of the TACC is found at paragraph 17. The portion highlighted states:

"Neither the Company nor Mr. Malesardi negotiated the terms of the Agreement between the Brodericks and Mr. Bekiri. The Agreement is an arms-length transaction freely negotiated and entered into by the Brodericks and Mr. Bekiri and involves no other parties."

It is clear, upon a review of the AIA form contract that 1) it is a preprinted form contract distributed by the American Institute of Architects, and 2) the only handwriting except for the signatures on the document was written by Steven Malesardi.

Mr. Finkel defends that allegation by arguing that since Mr. Bekiri lied about ever having signed it, and because the contract states that Mr. Bekiri is the "contractor" in the

contract and because the parties could have made amendments that they didn't make, therefore Steven Malesardi did not negotiate it even though it was in his handwriting.

This defense is unavailing. Mr. Finkel knew when the TACC was written that both Mr. and Mrs. Broderick had testified at deposition that Mr. Malesardi had prepared the contract had entered all the handwritten terms, had attached Mr. Malesardi's drawings and cost projections and took it to the Brodericks for signature. He further knew that Mr. Bekiri was not present at the time of Mr. Broderick's signature and that Mr. Bekiri denied signing it at all. There is no evidence cited in the opposition to this motion (or presented at the trial) that can support the allegation that Steven Malesardi did not negotiate terms of the agreement when all the written language in the form contract was in his hand and it was his documents attached to the contract and when all the parties to the contract either disavowed it (Bekiri) or testified that Malesardi brought it to them in a final form to sign. Moreover, there is no evidence to underpin the allegation that the agreement was "negotiated and entered into by the Brodericks and Mr. Bekiri" as there is no evidence Mr. Bekiri ever spoke to either of the Brodericks about it either prior to its formation or at any time afterwards.

Nothing in the body of the contract relating to its written terms or evidence known when the TACC was drafted can support the allegation that Mr. Bekiri negotiated this contract with the Brodericks.

The allegation is without any evidentiary support and it was objectively unreasonable to have alleged it as true in the TACC.

3) The Third Purportedly Unsupported Allegation

The next cited allegation is found at paragraph 21 of the TACC. It alleges in relevant part:

"On the basis of information and belief, the Brodericks then anonymously reported their own home improvement project to the Contractors State License Board ("Board") on the grounds that Mr. Malesardi and Mr. Bekiri were working as unlicensed contractors and had failed to secure workers compensation insurance for the tradesmen working on the site."

In opposition to the motion, the responding party first argues that by prefacing the allegation with the language "on information and belief," the allegation automatically comes within that part of CCP § 128.7 which describes an allegation as one that is "specifically… identified…[as] likely to have evidentiary support after a reasonable opportunity for further investigation or discovery."

Responding party is not correct in this argument. The preface "on the basis of information and belief" is <u>not</u> a specific identification that the alleging party has no evidentiary support at the time but believes it likely that evidentiary support will be developed. The plain language of the phrase "on informational belief," is that the alleging party has information to support his or her believe in the truth of the allegation.

As previously noted, there are no allegations in the TACC which have been specifically identified as allegations for which the party making the allegations has no evidentiary basis to support the allegation but believes it is likely that evidentiary support can be developed with further investigation or discovery.

The evidentiary basis for the allegation put forward by responding party in his declaration is that the CSLB complaint identified Steven Malesardi as the unlicensed contractor. Mr. Finkel then speculated that the Brodericks were the only people with the knowledge of his identity and therefore the allegation that the Broderick's phoned in the complaint must be true. On the other hand, one could speculate that Mr. Malesardi, another person with the knowledge that he and Mr. Bekiri were unlicensed contractors, could have been the person who filed the anonymous complaint. After all, one could conclude that Mr. Malesardi was the single person who profited most by ending his participation on the project after the Broderick's friend, Mr. Northover, advised them to stop paying Mr. Malesardi and Mr. Bekiri until all the work they had already paid for was completed and after the Brodericks had told Mr. Malesardi they were doing so.

Nonetheless, while it may be a close call, the evidentiary information that the CSLB investigator knew the name of the unlicensed contractors is enough for the court to determine that it is not objectively unreasonable to have made the speculative deduction. Unlike the other allegations in the TACC on which this motion is based, there is actually some shred of evidence underpinning the allegation.

4) The Fourth Purportedly Unsupported Allegation

The next cited allegations are allegations of fraud and misrepresentation found in paragraphs 42, 43, and 44:

42. The Brodericks intentionally concealed from the Company and Mr. Malesardi the fact that they had no experience working as general contractors on any previous construction projects and were completely incapable of managing the construction of the renovations to their residence in Berkeley. In fact, the Brodericks affirmatively told Mr.

Malesardi that they were capable of applying for construction permits from the City of Berkeley as owner-builders of the renovation project, serve as the general contractors for their project, and manage the construction of their project on their own.

43. The Brodericks knew the representations they made to the Company and Mr. Malesardi about their experience as general contractors and their ability to manage the construction of their renovation project were false. The Brodericks knowingly concealed from the Company and Mr. Malesardi that they had no experience working as general contractors or construction managers on their home renovation project or any other construction project.

44. The Brodericks made the false representations to persuade the Company and Mr. Malesardi to enter into the Contract under which the Company would provide only construction observation services, and not provide any construction management or general contracting services because the Brodericks would provide all of those services for themselves. By doing so, the Brodericks hoped to save money on the cost of their renovation project and avoid having to pay a licensed general contractor for construction services and construction management services.

The allegations are part of the cause of action that the Brodericks fraudulently induced Steven Malesardi to enter into the IFT contact. Nothing in the eight pages of Mr. Finkel's declaration (Supplemental Declaration pages 22-30) identifies any evidentiary fact supportive of the allegations that the Broderick concealed their lack of experience as general contractors or made affirmative representations about their experience as general contractors. There is no evidence at all cited in the declaration supporting any allegation about what the Brodericks represented or didn't represent in order to induce Steven Malesardi to enter into the contract.

Moreover, the citation to events and documents occurring at a later point in time and which make no reference to any formation discussions are not evidentiary facts that support the allegation that something was said or was not said at the time of the formation of the contract.

It is manifestly objectively unreasonable to conclude that the Brodericks must have made such representations and that Steven Malesardi must have relied on such false representations or he wouldn't have entered the contract.

5) The Fifth Purportedly Unsupported Allegation

The next cited allegations are those made in the Fourth Cause of Action for Fraud and Deceit by the Brodericks.

The 4th Cause of Action of the TACC alleges in relevant part following allegations:

> 49. Cross-complainants claim they were harmed because the Brodericks made misrepresentations and false promises and concealed certain information about their renovation project, and their ability to serve as the general contractor and construction manager for that project.
>
> * * *
>
> (c) the Brodericks intended the cross-complainants to rely on the false representations or false promises or intended to deceive the cross-complainants by concealing the true facts; (d) the cross-complainants reasonably relied on the Brodericks' misrepresentations, concealments and false promises, and the cross-complainants would have behaved differently if the true facts had been disclosed to them; (e) the cross-complainants were harmed by the Brodericks deceptions; and (f) their reliance on the Brodericks' misrepresentations, false promises or concealment of the true facts were substantial factors in causing their harm.
>
> * * *
>
> 50. The Brodericks informed Mr. Malesardi that they possessed the skills necessary to act as their own general contractor and supervise the construction of their own project.
>
> * * *
>
> They informed Mr. Malesardi and the other professionals that they did not require any general contracting or construction management services from him or anyone else working with the Company.
>
> * * *
>
> 51. The Brodericks knew the representations they made to the Company and Mr. Malesardi about their experience working as general contractors and supervising

construction projects were false when they made them. The Brodericks did not intend to perform the promises they made to the Company and Mr. Malesardi – and the City of Berkeley – when they said they would serve as the general contractor and construction manager for their renovation project in Berkeley. In fact, the Brodericks intended to conceal from the Company and Mr. Malesardi – and the City of Berkeley – the true facts about their skills, or lack thereof, to serve as general contractor and construction manager on their project, and did so until their failure to construct and manage the project resulted in lengthy delays in the construction schedule, substantial cost overruns in the budget, and repeated failures of building inspections conducted by the City of Berkeley.

52. The Brodericks intended the Company and Mr. Malesardi to rely on the false statements, false promises and concealment of the actual facts about their inability to serve as general contractors and construction managers for their project because they wished to save money by avoiding retaining a qualified general contractor to perform the construction work on their home. The Brodericks served as their own general contractor on their project and in that capacity totally failed to complete the work. Only after the Brodericks failed to properly serve as the general contractor for their project, and failed to properly supervise the tradesmen who worked on their project, did they seek to shift blame for their failures to the Company and Mr. Malesardi and other professionals who worked on the project. The Brodericks seek to blame the Company and Mr. Malesardi for failing to provide general contracting and construction management services the Company never contracted to provide to them. But the Brodericks needed someone to blame for the poorly performed work, cost overruns, failed inspections, and workers compensation insurance debacle caused by their incompetence and dishonesty so they sought to blame Mr. Malesardi and the other professionals who worked on their project. The Brodericks then reported their own home renovation project – for which they received a building permit from the City of Berkeley to serve as their own general contractor – to the Contractor State License Board for failure to comply with state contracting and employment laws in an attempt to blame Mr. Malesardi and the other professionals for their own failures.

* * *

53.... As a direct result of the Brodericks' failure to competently serve as the general contractor for their home renovation project, properly supervise the tradesmen employees who worked on the project, and failure carry the required workers' compensation insurance for all of the workers they hired and were required to supervise, the project ground to halt, and all work was stopped by inspectors from the Contractors State License Board. The Brodericks erected a fence around their property, ceased all

construction work, and forbid Mr. Malesardi and the other professionals from entering the property to prevent them from observing the progress of construction. The failure of the Brodericks' home renovation project, caused entirely by their fraud, became well known in the San Francisco Bay Area's community of professional designers and architects of which Mr. Malesardi was a member.

The allegations in this cause of action (other than paragraph 49 which the court reads as one without allegations of fact) are the following:

1. Affirmative misrepresentations by the Brodericks that they possessed the skills necessary to act as a general contractor to supervise the construction of the building project.
2. Affirmative misrepresentation to Mr. Malesardi and to "other professionals" that they did not require general contracting or construction management services.
3. That the Brodericks knew the affirmative misrepresentation were false when the affirmative misrepresentations were made (at the time of formation of the IFT contract).
4. That the Brodericks did not intend to perform a promise to Mr. Malesardi to perform as contractors, and did not intend to perform a promise to the City of Berkeley (presumably at a time when the Brodericks entered into some contract with the City) to perform as a contractor.
5. That the Brodericks intended that Mr. Malesardi rely on their false allegations of competence to perform as general contractors.
6. That the Brodericks failed to serve as general contractors, failed to supervise workers, and failed to carry the required workers compensation insurance.
7. That the failure of the Brodericks' home renovation project was caused entirely by their fraud and that their defrauding Mr. Malesardi became well known in the San Francisco Bay Area's community of professional designers and architects of which Mr. Malesardi was a member.

The responding party's Declaration points to no evidence to support those allegations. Mr. Finkel's Supplemental Declaration incorporates the discussion in defense of his allegations of fraud in the Third Cause of Action. And like the conclusions reached in the discussion of the allegations of fraud in the third cause of action, there is just no evidence presented from which anyone could conclude in an objectively reasonable manner that either of the Brodericks made any of the alleged affirmative misrepresentations.

Moreover, in paragraph 50, the affirmative misrepresentations are alleged to have been made to Mr. Malesardi and to other professionals. The opposition to the motion does not identify those other professionals or provide any evidence from them as to the alleged misrepresentations. Surely, if they existed, the opposition to this motion would have included their declarations regarding the alleged misrepresentations.

The allegations that the Brodericks knew the falsity of their affirmative misrepresentations are apparently based on the evidentiarily unsupported assertion that the Brodericks "did not require any contracting or construction management services from IFT." There is no evidence of such affirmative misrepresentations, and the signing of the IFT contract does not support an allegation of knowledge of the falsity of any misrepresentations. It is worthy of note that the opposition to this motion suggests that Mr. Malesardi was prepared to offer those services even though he was not licensed to perform them, even though there is no evidence to support that suggestion either.

With regard to the allegations of the Brodericks' intention that Steven Malesardi rely on the misrepresentations, the allegation would be evidentiarily supported if there was any evidentiary support for the existence of the alleged misrepresentation, however, there is none whatever.

The court finds that the allegations of misrepresentations to Steven Malesardi (and to others) in the Fourth Cause of Action were not based on any evidentiary underpinning at all and that it was not objectively reasonable to have authored, signed and filed the TACC with those allegations.

6) The Sixth Purportedly Unsupported Allegation

The final cited allegation is found at paragraph 72 of the TACC and reads as follows:

> 72. IFT suffered substantial financial damages as a direct result of the Broderick's acts and omissions discussed above. The Broderick's failure to secure and pay a licensed and competent general contractor to construct the renovations to their home, and failure to give IFT access to the property so it could observe the construction work in progress, resulted in the Company suffering substantial financial losses. The Broderick's acceptance of an owner-builder building permit they were not competent or qualified to receive, and retention of an unlicensed and unqualified building contractor to construct the renovations to their home, adversely impacted IFT's ability to perform the construction observation services under the design contract, and resulted in substantial financial losses to the Company. The Broderick's failure to hire competent tradesmen to work on their project, their failure to supervise the tradesmen, and their subsequent demand that IFT provide additional construction observation services – as well as construction administration and construction management services IFT was not contracted to provide – resulted in substantial financial losses on the Company. The Broderick's failure to purchase workers compensation insurance to protect the tradesmen and builders that were hired to work on their project, placed IFT at legal risk and imposed substantial financial losses on the Company. The Broderick's acts and omissions were the

proximate or legal cause of the resulting financial injuries suffered by the cross-complainants as a result of the Broderick's neglect.

The evidentiary basis asserted in defense of this motion regarding this set of allegations points to an expert witness evaluation that the "termination" of the contract created damages in favor of the cross-complainant. That is, in fact, a sufficient evidentiary basis for the allegations in first sentence of the paragraph even though not factually true. However, the allegations in the remainder of the paragraph of acts by the Brodericks are utterly false and have no evidentiary basis. At the time the TACC was written, every person involved in this case knew for certain that Mr. Malesardi had brought Mr. Bekiri into the project and that Mr. Bekiri was a "handyman" and not a licensed contractor. The allegation that the Brodericks' failure to hire competent tradesman to work on project, their failure to supervise the tradesman, and their subsequent demand that IFT provide additional construction observation services as well as construction administration and construction management services IFT was not contracted to provide – resulted in substantial losses to the company is utterly false and its falsity was known by all the parties and lawyers in this case at the time the TACC was presented. The Brodericks never hired any tradesmen, they were all hired by Mr. Malesardi or by Mr.Bekiri until after the CSLB stopped the job. The Brodericks never supervised any of the tradesman. When they were upset at the clutter Mr. Bekiri wasn't cleaning up, they contacted Mr. Malesardi or his assistant Ms. Murata to complain. There was never any demand for additional construction services or any evidence to support that allegation. Mr. Finkel could not have been unaware of the falsity of those allegations

when he authored and filed the TACC, and there has been no evidentiary underpinning to which the court has been directed that can justify their inclusion in the TACC.

It is clear to this court that the TACC is based on numerous allegations and factual contentions that are not support by any actual evidence and that Mr. Finkel presented it to the court and litigated it primarily to harass the plaintiffs, to cause unnecessary delay, to needlessly increase the cost of litigation and to create a billing opportunity for himself.

Such conduct as is described above warrants the impositions of sanctions.

SANCTIONS

CCP § 128.7(d) instructs, inter alia, that:

(d) A sanction imposed for violation of subdivision (b) shall be limited to what is sufficient to deter repetition of this conduct or comparable conduct by others similarly situated. Subject to the limitations in paragraphs (1) and (2), the sanction may consist of, or include, directives of a nonmonetary nature, an order to pay a penalty into court, or, if imposed on motion and warranted for effective deterrence, an order directing payment to the movant of some or all of the reasonable attorney's fees and other expenses incurred as a direct result of the violation.

In the defense of this motion, the responding party, Mr. Finkel has chosen the same path that he followed in drafting a cross-complaint when he had no objective reason to believe the facts he put into the cross-complaint were true. He continues to insist that the allegations were proper and that his duty to be a zealous advocate for his client justified his conduct.

The stark truth of the matter is that Mr. Finkle had no evidentiary basis to, for example, assert allegations that Mr. Malesardi made any representations to the

Brodericks or that the Brodericks made any specific representations to Mr. Malesardi in the contract formation process. That is, there were no supporting documents, or witnesses, or acts by anyone that could support the allegations.

While much can be said for "zealous advocacy", it goes beyond the bounds of zealous advocacy to invent factual allegations in order to file and to pursue a cross-complaint whose allegations could never be proven. The court is persuaded to a clear and convincing standard of proof, if not more, that the TACC was filed to harass, delay and needlessly increase the cost of this case.

Moreover, the argument that an attorney has an objectively reasonable basis to believe the truth of any purported fact, as asserted in Mr. Finkel's Declaration, based on his evaluation of the body language of the adverse party at deposition whose testimony was directly contrary to the purported fact is an argument this court finds utterly without merit.

Likewise, an attorney is not objectively reasonable in making otherwise unsupported allegations based on his evaluation that, even though the testimony of the adverse party is directly contrary, the adverse party has "willful blindness equating to knowledge."

Mr. Finkel does not recognize the seriousness of his transgression of CCP § 128.7.

It is fundamental that a lawyer not invent allegations to include in pleadings or allege facts in pleadings that are unsupported by any factual underpinning. Aside from the practical problems it may create for one's client, this is an ethical obligation and a statutory obligation.

In the determination of the appropriate sanction in this matter the court has considered the uncontroverted declaration from the Brodericks' counsel of the needless excess cost necessitated by the TACC (which was not controverted in the motion), the certainty of the misconduct (it is quite certain), the seriousness of the misconduct (the seriousness of Mr. Finkel's conduct cannot be overstated), and the least amount of sanction necessary to deter repetition of this conduct.

Sanctions are imposed on Lonnie Finkel and the Finkel Law Group, P.C. in the total sum of $302,000.00. Of that amount $110,000.00 shall be paid to the cross-defendants Colleen Broderick and Sean Broderick to compensate them for the reasonable attorney's fees and other expenses incurred as a direct result of the violation of CCP § 128.7, and the remaining $192,000.00 shall be paid to the court. One hopes that being sanctioned 50% of the actually received fees will deter Mr. Finkel from any similar conduct in the future.

The sanctions are due and payable forthwith and will incur interest at 10% from the date of this order.

IT IS SO ORDERED

Dated: August 23, 2024

Frank Roesch
Judge of the Superior Court

| SUPERIOR COURT OF CALIFORNIA<br>COUNTY OF ALAMEDA | Reserved for Clerk's File Stamp<br><br>FILED<br>Superior Court of California<br>County of Alameda<br>08/26/2024<br>Chad Finke, Executive Officer / Clerk of the Court<br>By: _____ Deputy<br>P. Bir |
|---|---|
| COURTHOUSE ADDRESS:<br>Rene C. Davidson Courthouse<br>1225 Fallon Street, Oakland, CA 94612 | |
| PLAINTIFF/PETITIONER:<br>Colleen Broderick et al | |
| DEFENDANT/RESPONDENT:<br>Gloria Malesardi as Executor of the Estate of Steven Malesardi et al | |
| **CERTIFICATE OF ELECTRONIC SERVICE CODE OF CIVIL PROCEDURE 1010.6** | CASE NUMBER:<br>HG21103647 |

**I, the below named Executive Officer/Clerk of Court of the above-entitled court, do hereby certify that I am not a party to the cause herein, and that on this date I served one copy of the Order Granting Motion for Sanctions entered herein upon each party or counsel of record in the above entitled action, by electronically serving the document(s) from my place of business, in accordance with standard court practices.**

DAVID S. MCMONIGLE
LONG & LEVIT LLP
dmcmonigle@longlevit.com

Gloria Malesardi as Executor of the Estate of Steven Malesardi
globird@me.com

Jivaca Candappa
Candappa OLaw Firm
jcandappa@candappalaw.com

Lonnie Finkel
Finkel Law Group PC
info@finkellawgroup.com

Chad Finke, Executive Officer / Clerk of the Court

Dated: 08/26/2024

By:

P. Bir, Deputy Clerk

## CERTIFICATE OF SERVICE OF DOCUMENT OTHER THAN COMPLAINT

Unless all parties to the case, including you, are electronic filers, you must serve each document you file by sending or delivering it to the opposing side. Complete this form and include it with the document that you file and serve.

1. **Case Name:** GLORIA MALESARDI v. LONNIE FINKEL
2. **Case Number:** 3:25-cv-09875-VC
3. **What documents were served?** Write the full name or title of the document(s)
   AMENDED COMPLAINT
4. **How was the document served?** Check one:
   - ☐ Placed in U.S. Mail
   - ☐ Hand-delivered
   - ☐ Sent for delivery (e.g., FedEx, UPS)
   - ■ Sent via email [if the other party has agreed to accept service by email]
5. **Who did you send the document to?** [Write the full name and contact information for each person you sent the document.]

   Stephanie Yee | Stephanie.Yee@wilsonelser.com
   Wilson Elser Moskowitz
   655 Montgomery Street Suite 900
   San Francisco, CA 9411
6. **When were the documents sent?** March 7, 2026
7. **Who served the documents?** [Whoever puts it into the mail, emails, delivers, or sends for delivery should sign, and print their name and address. You can do this yourself.]

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Signature: Gloria Malesardi

Name: GLORIA MALESARDI

Address: 2263 Fifth Street East Meadow, NY 11554